# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6291 | **DATE** | 11/3/2003 |
| **CASE TITLE** | Deacon vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  For the reasons stated on the attached Memorandum Opinion and Order, defendant's motion for summary judgment [16-1] is granted and plaintiff's motion for summary judgment [10-1] is denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 04 2003 | |
| | Notified counsel by telephone. | | date docketed | 21 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | 11/3/2003 | |
| | Copy to judge/magistrate judge. | 03 NOV -3 PM 3:34 | date mailed notice | |
| KF | courtroom deputy's initials | Date/time received in central Clerk's Office | KF mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEGLYN T. DEACON, | ) | **DOCKETED** |
| Plaintiff, | ) | NOV 0 4 2003 |
| | ) No. 02 C 6291 | |
| v. | ) | |
| | ) Mag. Judge Michael T. Mason | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

The plaintiff, Meglyn Deacon ("Deacon"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Deacon's claim for disability insurance benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d). Defendant Barnhart has filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and for the following reasons we affirm the decision of the ALJ and grant defendant's motion for summary judgment.

### Procedural History

Deacon filed an application for DIB on May 19, 1999 alleging disability since June 1, 1996. (R. 75). Deacon's application was denied initially and upon reconsideration. (R. 65, 71). On December 14, 2000, ALJ Edward Gustafson conducted a hearing at which Deacon testified and on March 6, 2001, the ALJ issued an opinion denying Deacon's claim. (R. 14-22). The ALJ found that Deacon was

2

capable of performing her past relevant job as a surgical supply worker and, therefore, was not disabled. (R. 22). On July 16, 2002, the Appeals Council denied Deacon's request for review. (R. 6-7). Consequently, the decision of ALJ Gustafson became the final decision of the Commissioner. See Zurawski v. Halter, 245 F.3d 881 (7th Cir. 2001); Reg. § 416.1481.

### Plaintiff's Testimony

Born on June 20, 1943, Deacon was 57 years old at the time of the ALJ's hearing. (R. 75). She has a tenth grade education and from 1978 to 1991, she worked as a surgical supply worker. (R. 91). Thereafter, she briefly worked as a cleaning and maintenance employee in a hotel and then as a nurse assistant at a rehabilitation center. (R. 28-29). Deacon testified that she has not worked since 1996. (R. 55).

At the hearing, Deacon testified that she fell and broke her ankle in 1990. (R. 48-49). She claims that as a result of that injury, she still has trouble standing and experiences pain from her ankle to her back. (R. 49). Deacon also stated that she has back pain from a 1996 fall. (R. 31). She stated that her doctor recommended some exercises for her back and that they helped. (R. 41). Deacon also testified that once or twice a day she suffers from dizzy spells that make her feel like she is going to pass out. Additionally, she said that she has pain in her neck and shoulder. (R. 46). Deacon told the ALJ that she is often depressed and has trouble picking things up because of numbness in her fingers and pain from arthritis. (R. 45). She said that she has trouble dressing and combing her hair and that she suffers from heart palpitations. (R. 45, 56). Despite these ailments, Deacon testified that she helps around the house,

goes to the store, cooks, aids in caring for her grandchildren and performs other household activities. (R. 57-58). Deacon is also able to drive a car. (R. 59).

## Plaintiff's Medical Examinations

The administrative record, including the supplemental medical records specifically requested by the ALJ, chronicle Deacon's medical complaints. From 1995 to 1998, Deacon sought medical treatment at the Southern Regional Medical Center ("Center") in Georgia. She first went there on June 19, 1995, complaining of dizziness and blurred vision. (R. 379). Records from the visit also reflect that her blood pressure was high at 192/110 and 174/102, and that she had not been taking any blood pressure medication for six months prior to the visit. (R. 379). The doctor prescribed Procandia. (R. 379-80). At followup visits on June 26 and July 11, Deacon told the doctor that she was not experiencing chest pains, shortness of breath, or dizziness. (R. 365, 386).

In August, Deacon returned to the Center complaining of intermittent pain and decreased ability to bear weight as a result of her 1990 broken ankle. (R. 362). Then in October, she complained of chest pain and tightness radiating to her left arm after not taking her medication the day before. (R. 354). Deacon returned to the Center in April, 1996 to have her blood pressure checked and to refill her medication. (R. 238). At that time, she told the doctor that she was not experiencing any chest pains, shortness of breath or dizziness; but that when her blood pressure increased, she did have a "funny feeling" in her left arm, "like it was asleep." (R. 238).

Deacon began the new year with a return to the Center in January, 1997. (R. 236-37). She complained of headaches and the doctor increased her blood pressure medication. (R. 236-37). In April, she went for a blood pressure check and told the

3

doctor that she was "feeling well." (R. 221-22). Five days later on April 23, she returned complaining of a week long stomach pain. (R. 218). The doctor suspected an ulcer and prescribed Prevacid, over the counter Pepcid AC and a diet of bland food. (R. 218-20). Deacon returned on April 26 still complaining of a stomach pain, but refused further testing because she was going to be traveling. (R. 217). At Deacon's last 1997 visit, on September 26, she had her blood pressure checked and complained of a cough. (R. 261). The doctor diagnosed hypertension and congestion. (R. 261).

In February 1998, Deacon returned for another blood pressure check and to report that since January, at times, she felt like she was going to pass out when she moved or got up too quickly. (R. 213). Deacon also said that sometimes she suffered leg cramps not related to walking and that her fingers seized up. (R. 213). The doctor diagnosed Deacon with varicosities on her right leg and a pedal edema. (R. 213). However, he also noted that Deacon was not in any apparent distress and was able to walk without difficulty. (R. 213). The doctor instructed Deacon to elevate her feet and legs whenever possible and to avoid making quick movements. (R. 214).

In May, Deacon returned to the Center for a regular exam and complained of pain in her back, hip and legs. (R. 206). She also reported that her leg cramps had improved. (R. 206). The doctor noted muscle tenderness in her lumbosacral area and an enlarged thyroid. (R. 206). He also diagnosed sciatica and prescribed Anaprox and Robaxin for pain. (R. 205-207). In August, Deacon came back for a refill on her blood pressure medication and the doctor noted that she still had an edema and hypertension. (R. 194). Deacon had her blood pressure checked again in November and told the doctor that she was feeling good, but had occasional dizziness and hot

4

flashes. (R. 192).

On March 16, 1999, Deacon sought treatment from Daniel J. Grzegorek, D.O., for the first time. (R. 123). She scheduled the appointment to check her blood pressure and for treatment of a burning pain and numbness in her left neck. (R. 123). She also complained of some dizziness and low back pain. (R. 123). On examination, Dr. Grzegorek noted that Deacon had some tenderness to the left cervical paraspinal muscles, but that no other abnormalities were present. (R. 123). Deacon's lumbosacral spine showed a good range of motion and had no palpable tenderness. (R. 123). Dr. Grzegorek also noted that Deacon did not have an edema. (R. 123). Dr. Grzegorek diagnosed Deacon with hypertension, "left neck pain with paresthesias of the left side of the head," vertigo and low back pain. (R. 123). He gave Deacon instructions on exercises to help stretch and strengthen her back and neck. (R. 123).

Deacon returned to Dr. Grzegorek for an April follow-up appointment. (R. 124). At that time, she reported that her head and back pain were better, but that she experienced occasional dizziness and lightheadedness. (R. 124). Her lab tests showed that she suffered from mild anemia, and Dr. Grzegorek recommended an iron supplement. (R. 124). He diagnosed Deacon with lightheadedness, anemia and hypertension, and ordered a thallium stress test to determine if there was a cardiac source for her lightheadedness. (R. 117, 124).

Deacon returned in June complaining of back pain and heart fluttering that seemed to occur when she was under a lot of stress. (R. 125). Dr. Grzegorek noted that Deacon "is under a considerable amount of stress at work" and diagnosed heart palpitations, atypical chest pain symptoms and hypertension. (R. 125). He prescribed

Voltaren and gave her exercises for her back. (R. 125).

In August, 1999, Stanley Rabinowitz, M.D., performed a consultative medical examination of Deacon at the request of the Social Security Administration ("SSA"). (R. 127-29). Deacon reported hypertension for the past seven years and arthritis with low back and cervical pain for the past four years. (R. 127). She complained of intermittent vertigo and dizziness, constant low back pain that did not radiate and cervical spine pain that radiated down her left arm. (R. 127). On a scale of one to ten with ten being the most severe, Deacon rated her low back pain as a nine and her cervical spine pain as an eight. (R. 127). Deacon reported that she was taking Triamterene for her hypertension and Diclofenac and Methocarbamol for her pain. (R. 127). Deacon also reported difficulty lifting more than 20 pounds or bending or standing for a long period of time. (R. 127).

Dr. Rabinowitz observed and noted that Deacon could walk normally and did not have an edema, but she did have moderate varicose veins in her right leg. (R. 128). He also noted that straight leg raising was negative, and Deacon's gait and station were normal. (R. 129). Dr. Rabinowitz concluded that the range of motion of all of Deacon's joints and spine were within normal limits. (R. 128). Deacon's grip in both hands appeared normal, her finger dexterity was not impaired and her motor strength was intact. (R. 128-29). Dr. Rabinowitz also reviewed x-ray results that showed degenerative changes in her cervical and lumbar spine. (R. 130). Ultimately, Dr. Rabinowitz determined that Deacon was in essentially good control of her hypertension and that there was no obvious evidence of organ damage or cardiac, renal or neurological impairment. (R. 129). Dr. Rabinowitz diagnosed Deacon with

hypertension, chronic lumbar and cervical pain syndromes, exogenous obesity and mild anemia. (R. 129).

On September 15, 1999, Calixto F. Aquino, M.D., performed a residual functional capacity ("RFC") assessment of Deacon again at the request of the SSA. (R. 132-33). After reviewing Deacon's medical records, he concluded that she could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk 6 hours in an 8-hour workday and sit for a total of 6 hours in an 8-hour workday. (R. 133). He also noted that Deacon suffered from back pain and her X-rays showed degenerative changes, but she had no loss in her range of motion. (R. 139). Harry Bergmann, M.D., also reviewed Deacon's medical records and affirmed Dr. Aquino's RFC assessment. (R. 132).

In October, Deacon returned to Dr. Grzegorek complaining of vertigo, a cough and congestion. (R. 125). Dr. Grzegorek diagnosed sinusitis, dizziness/vertigo and hypertension. (R. 126). Then in November, Deacon saw Dr. Grzegorek for a burning sensation in her left breast. (R. 126). In February 2000, Dr. Grzegorek diagnosed Deacon with bronchitis, hypertension and back pain when she sought treatment for a nonproductive cough and chronic low back spasms. (R. 155). Dr. Grzegorek removed Deacon's skin tags in March. (R. 155). At that time, she asked him to fill out a RFC assessment. (R. 155). Dr. Grzegorek declined because filling out those forms was not part of his medical practice, and referred her to Dr. Hendricks for the RFC assessment. (R. 155).

On March 15, Deacon visited Douglas J. Hendricks, M.D., for the first time and complained of lower back pain since 1989, degenerative joint disease of her shoulders

7

and neck, depression, occasional lightheadedness and week hands since 1996. (R. 151). She stated that her lower back pain increased with walking and occasionally radiated into her left leg. (R. 151). Dr. Hendricks noted that Deacon had not worked in three years and diagnosed her with chronic neck, back, and shoulder pain, depression and anxiety. (R. 151). He prescribed Paxil for her depression and anxiety. (R. 151).

On March 29, Deacon returned to Dr. Hendricks for a reevaluation; her second and final visit with him. (R. 153). Dr. Hendricks noted that her psychological symptoms had improved, but her overall pain had not. (R. 153). At that time, Dr. Hendricks recommended that Deacon undergo a formal functional capacity evaluation, like the one Dr. Rabinowitz performed, to provide some objective evidence of her abilities. She declined to have the evaluation because she did not think that her insurance would cover the $150 - $300 cost. Because Deacon declined to have a formal functional capacity evaluation, Dr. Hendricks filled out the RFC assessment form during a half hour consultation with her. (R. 153). He summarized Deacon's limitations as chronic pain in the neck, back and both shoulders and weakness and numbness in her arms and hands. (R. 153). In the report, Dr. Hendricks repeatedly stated that his findings were based on Deacon's subjective reports. (R. 141-42).

Dr. Hendricks concluded that Deacon could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds. (R. 141). He also indicated that Deacon could stand and/or walk less than 2 hours in an 8-hour workday, she must periodically alternate sitting and standing to relieve pain in her back and neck and Deacon could only push and/or pull for less than 10% of an 8-hour day. (R. 141). He concluded that Deacon had postural limitations based on her subjective report of

8

pain and weakness. (R. 142). He also indicated that she was limited in reaching, handling, fingering and feeling because of weakness and numbness in her arms and hands and that she was limited in overhead work due to shoulder pain. (R. 143). Dr. Hendricks indicated that Deacon should avoid all exposure to extreme cold, fumes and hazards, and she should avoid concentrated exposure to vibrations and noise. (R. 144).

In May, Deacon returned to Dr. Grzegorek, her primary physician, for a routine follow-up. (R. 156). Deacon reported that she was feeling better and was doing well since taking Paxil. (R. 156). Dr. Grzegorek diagnosed Deacon with hypertension and depression. (R. 156). In July, Dr. Grzegorek diagnosed hypertension, depression and mild dizziness. (R. 157). At that visit, Deacon stated that her depression and headaches had improved. (R. 157). In October, Dr. Grzegorek treated Deacon for a cough and congestion and noted that she had been experiencing some visual light flashes in her left eye for quite some time. (R. 158).

## Standard of Review

This court's review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence and whether they are based upon legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not substitute its judgment for that of the ALJ by deciding facts anew, reweighing the

9

evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

## Legal Analysis

Deacon raises four main issues on appeal. She contends that the ALJ (1) impermissibly ignored the extensive medical record submitted subsequent to the hearing; (2) erroneously found that Dr. Grezegorek's notes did not support Dr. Hendricks' RFC assessment and that Deacon retained the RFC to perform medium level work even though Dr. Hendricks opined that she could do less than a full range of sedentary work; (3) erroneously found that plaintiff's allegations of pain and side effects from medication were not credible and indulged in impermissible speculation that plaintiff was working on June 22, 1999; and (4) incorrectly applied the Medical-Vocational Guidelines to deny plaintiff's claims even though plaintiff alleged non-exertional impairments. We will address each argument in turn, ultimately finding all without merit. Therefore, we affirm the ALJ's decision.

A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. I 423(d)(1)(A) (2000). In determining whether a claimant is disabled, the ALJ conducts a five step analysis. As part of the analysis the ALJ determines, in sequence: (1) whether the claimant is presently unemployed, (2) whether the claimant's impairment is severe, (3) whether the impairment meets or exceeds any of the specific impairments listed in

the regulation, (4) whether the claimant is unable to perform his or her previous occupation, and (5) whether the claimant is unable to perform any other work. *Cochon v. Barnhart*, 222 F. Supp. 2d 1019, 1025 (N.D. Ill. 2002) (citing 20 C.F.R. i 416.920 (a)-(f)). An affirmative answer at steps 3 or 5 will lead to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985). A negative answer at any step, other than step 3, will result in a finding that the claimant is not disabled. *Id.* The claimant has the burden of proof for steps 1 though 4. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). The burden shifts to the Commissioner for step 5 of the analysis. *Id.*

Step four is the only contested phase of the ALJ's five step analysis. Both parties agree with the ALJ that Deacon was not currently gainfully employed; suffered from the severe impairments of "essential hypertension, controlled without end organ dysfunction; some occasional back and neck pain discomfort; exogenous obesity; and mild anemia" and did not have an impairment that met or medically equaled the requirements of the Listing of Impairments. Furthermore, the ALJ found that despite her impairments, Deacon had the RFC to perform medium work and could perform her medium level past relevant work as a surgical supply worker. Therefore, the ALJ did not reach step five of the process and did not address whether Deacon could perform other jobs in the economy.

### A. Supplemental Evidence

First, Deacon claims that the ALJ failed to consider relevant medical evidence of her impairment, namely her medical records from the Center. This argument has no

11

merit because the ALJ did consider this evidence. In fact, at the hearing the ALJ specifically requested that plaintiff supplement the administrative record by submitting her records from the Center for his review. Moreover, the ALJ cited information from these records in his opinion. He stated that the supplemental medical records indicate "that claimant was checked for cervical and breast cancer. She was treated for an ear infection. She complained of various pains. There is, however, no diagnosis, or other evidence, of a severe impairment."

While the ALJ must develop a full and fair record, he need not address every piece of testimony or evidence. *Diaz v. Carter*, 55 F.3d 300, 308 (7th Cir. 1995). The ALJ "must build an accurate and logical bridge from the evidence to his conclusion". *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ in this case developed a full and fair record and built a logical bridge from the evidence to his conclusion. He requested Deacon's medical records from the Center, reviewed them and accurately summarized them in his opinion. The ALJ properly considered all of the medical evidence and did not err as a matter of law.

### B. Weight of the Dr. Hendricks Opinion

Next, Deacon contends that the ALJ erred in failing to classify Dr. Hendricks as her treating physician and failing to give his RFC assessment that she could do less than sedentary work controlling weight. We find that the ALJ properly classified Dr. Hendricks as a nontreating medical source and accorded his RFC assessment proper weight. *See,* 20 CFR § 404.1502 (2000).

A treating physician is a physician with whom you have or have had "an ongoing

12

treatment relationship." 20 CFR § 404.1502 (2000). The ALJ concluded that Dr. Hendricks was not Deacon's regular treating physician. Deacon argues that Dr. Hendricks was indeed her treating physician, and, as such, Dr. Hendricks' opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence on the record. See, Clifford, 227 F.3d at 870; 20 C.F.R. i 404.1527(d)(2) (2003).

Deacon was referred to Dr. Hendricks by her treating physician, Dr. Grzegorek, for the purpose of obtaining a RFC assessment because Dr. Grzegorek did not do RFC assessments at his office. Deacon only visited Dr. Hendricks twice, once for an examination and once to fill out the RFC assessment. These two isolated visits do not constitute "an ongoing treatment relationship" and do not provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2003). Therefore, the ALJ properly determined that Dr. Hendricks was not Deacon's treating physician.

Moreover, even if Dr. Hendricks had been Deacon's treating physician, the ALJ correctly discounted his opinions because they were not well supported by acceptable medical techniques and were inconsistent with other substantial evidence in the record. (R. 20). A physician's opinion may be discounted if it is internally inconsistent or inconsistent with other evidence. Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). The ALJ noted that the limitations in Dr. Hendricks' RFC assessment were not supported by the medical opinions of Dr. Grzegorek. Just weeks before Dr. Hendricks' RFC assessment, Dr. Grzegorek examined Deacon and found only minor ailments including a cough, some low back spasms and skin tags that needed to be removed.

13

Additionally, Dr. Rabinowitz conducted a thorough physical examination and formal functional capacity evaluation of Deacon and did not find any abnormalities. He found that she could perform medium level work. Dr. Aquino affirmed that decision. The other medical evidence in the record did not support Dr. Hendricks' assessment. Moreover, Dr. Hendricks noted that his conclusions were based on Deacon's subjective reports and he recommended that she undergo a formal functional capacity evaluation to obtain objective evidence of her abilities. She had already undergone such an exam with Dr. Rabinowitz as discussed above. Therefore, the ALJ sufficiently articulated his reasons for discounting the weight of Dr. Hendricks' assessment and did not err as a matter of law.

### C. The ALJ's Credibility Determination

Third, plaintiff argues that the ALJ's credibility determinations are in error as a matter of law. Specifically, she contends that the ALJ incorrectly dismissed her complaints of pain and negative side effects from her medication and that he erred in finding that she was working in June, 1999.

An ALJ's credibility determination is given deference because the ALJ is in the best position to observe and hear the witness. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). A reviewing court will not disturb an ALJ's credibility determination unless the determination is patently wrong. *Zurwaski*, 245 F.3d at 887. However, an ALJ's decision must build a "logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811. An ALJ's credibility determination must include specific reasons for the finding, be supported by the evidence in the record and be specific

enough to show the weight the ALJ gave the claimant's statements and the reasons for that weight. *Zurawski*, 245 F.3d at 887.

In this case, the ALJ created a logical bridge between the evidence and his determination of Deacon's credibility. His opinion included specific reasons for his findings and was supported by the record. After listening to Deacon's testimony regarding her pain and reviewing her medical records, the ALJ found her pain allegations "suspect." The ALJ found that the treatment notes from both Dr. Grzegorek and Dr. Rabinowitz did not support the extreme limitations of function that Deacon alleged and he cited to specific examples.

The ALJ also correctly found that Deacon's allegations of negative side effects form her medication were not supported by her medical records. SSR 96-7p instructs the ALJ to evaluate the consistency of the claimant's statements in connection with the disability application and statements made in other circumstances. On her written application for disability benefits, Deacon mentioned negative side effects from her medication, but as the ALJ correctly noted, no medical notes supported her assertion. The ALJ did not err when he determined that Deacon's claims of side effects from her medication were not credible.

Lastly, Deacon contends that the ALJ erred in concluding that her overall credibility was eroded by a conflict regarding whether she was working on June 22, 1999. Dr. Grzegorek's notes indicate that Deacon was "under a considerable amount of stress at work" as of June 22, 1999. However, Deacon testified before the ALJ that she was not working in 1999. The ALJ did not use Dr. Grzegorek's notes to determine whether Deacon was engaged in substantial gainful activity. Instead, the ALJ used this

15

evidence as one of many factors in his overall determination that Deacon was not credible. The ALJ can take into consideration "the consistency of the [claimant's] statements with other information in the case record" in determining a claimant's credibility and did so in this case. SSR 96-7p; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2003). The ALJ properly considered this inconsistency and was not in error.

### D. Medical-Vocational Guidelines

Finally, Deacon alleges that the ALJ should not have relied on the Medical-Vocational Guidelines because of her non-exertional impairments, specifically pain and depression. An ALJ must consult a vocational expert when non-exertional limitations might substantially reduce the claimant's ability to perform a full range of work. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). In this case, there is substantial evidence that the non-exertional impairments claimed by Deacon had no significant affect on her ability to perform a full range of work. The ALJ concluded that Deacon's non-exertional impairments were not as serious or chronic as she alleged. (R. 20). As previously discussed, the ALJ's analysis of Deacon's credibility and non-exertional impairments are supported by the medical evidence. Therefore, the ALJ properly relied on the Medical-Vocational Guidelines instead of consulting a vocational expert.

## Conclusion

For all the foregoing reasons, this court finds that the ALJ's findings are supported by substantial evidence. Accordingly, we affirm the decision of the ALJ, grant defendant's motion for summary judgment, and deny the plaintiff's motion to reverse the final decision of the Commissioner of Social Security. It is so ordered.

ENTER:

*[signature: Michael T. Mason]*

**MICHAEL T. MASON**
**United States Magistrate Judge**

Dated: November 3, 2003